IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 2, 2017

**STATE OF TENNESSEE v. MARIO HUBBARD**

**Appeal from the Criminal Court for Shelby County**
No. 15-01036      **Chris Craft, Judge**

_____

**No. W2016-01521-CCA-R3-CD**

_____

A Shelby County jury found the defendant, Mario Hubbard, guilty of burglary of a motor vehicle and sentenced him to six years, as a career offender, in the county workhouse. On appeal, the defendant argues the trial court erred when allowing the jury to hear a statement he gave to the arresting officer prior to receiving *Miranda* warnings and when denying his request for a jury instruction on the destruction of evidence. The defendant further argues the jury's verdict was against the weight of the evidence and instead supported by his uncorroborated statement only. Based on our review of the record and pertinent authorities, we agree the trial court erred when denying the defendant's motion to suppress, but given the otherwise overwhelming evidence presented at trial, this error was harmless. For the same reason, the jury's verdict was not against the weight of the evidence. Finally, the evidence submitted at trial did not warrant a jury instruction on spoliation, so the trial court did not err when denying the defendant's request for the same. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

John R. Holton, Memphis, Tennessee, for the appellant, Mario Hubbard.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan J. Wardle, Assistant Attorney General; Amy Weirich, District Attorney General; and Carla Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On December 29, 2013, Corey Hentz, an officer with the Memphis Police Department (MPD), went to Chuck Hutton Chevrolet in Memphis, Tennessee to shop for a new truck. The dealership was closed at the time, and all the vehicles on the lot were locked. The dealership had not given permission for visitors to the lot to access the interior of the locked vehicles, but it was possible to walk through the closed lot and inspect the vehicles from the exterior. As Mr. Hentz did so, he observed "some legs hanging out of a truck" and approached the vehicle. The defendant was in the truck "doing something to the passenger side door panel in the mirror area." The defendant asked Mr. Hentz the price of the truck, and Mr. Hentz told him to check the sticker on the car window. As Mr. Hentz walked around the truck, he noticed some of the car paneling had been removed and there were bolts on the ground. Mr. Hentz then walked to an area of the parking lot where he could not be seen by the defendant and called MPD dispatch to report the suspicious activity. Mr. Hentz also gave a complete description of the defendant and the license plate number of a car parked close to the locked gate of the car lot.

Officer Kenneth Walcott, also with the MPD, responded to the call regarding a suspicious looking person in the parking lot of Chuck Hutton Chevrolet. Officer Walcott was driving past the car dealership at the time he received the call and responded in approximately fifteen seconds. He pulled into the parking lot as the defendant got into his car, noted a silver socket wrench in his hand, and asked the defendant to step out of the vehicle. When the defendant refused, Officer Walcott drew his weapon and again commanded the defendant to step out of the vehicle. Once the defendant complied, Officer Walcott detained him, placed him in the back of the vehicle, and said, "[T]hat was pretty bold what you did because of the fact there's [sic] cameras out here. I don't know if you know it, but it was an off duty police officer that saw you doing what you were doing and he made the phone call." The defendant responded, "I was just getting it for a friend of mine." Officer Walcott understood "it" to mean the side mirror to a maroon Chevrolet truck. He did not ask any follow-up questions because the defendant had not yet been Mirandized, and it was not his job to ask questions. The detectives would do so later.

Officer Walcott then contacted Kerry Melson, the general manager of Chuck Hutton Chevrolet, regarding the break-in. He and Mr. Melson discussed the video surveillance in the parking lot, and Mr. Melson was unsure it was working at the time. Mr. Melson did not follow-up with the dealership to obtain the video surveillance and, instead, assumed the detectives would obtain any existing video footage.

Officer Katie Patrick, also with the MPD, came to the scene and viewed the vehicle. The side mirrors had been taken off the body of the vehicle, and the car was

disassembled on the passenger side. There were rubber gloves in the front pocket of the defendant's hooded sweatshirt, and there was a silver socket wrench sitting inside his vehicle. She was informed there was video surveillance in the parking lot and noted in her report that "video surveillance of the incident is available and manger will retrieve it at a later date." She does not know what happened to the surveillance video.

At trial, the State called Kerry Melson, Corey Hentz, Officer Kenneth Walcott, and Officer Katie Patrick to testify and introduced photos of the damaged vehicle into evidence. Prior to calling Officer Walcott as a trial witness, the trial court held a hearing outside the jury's presence on the defendant's oral motion to suppress his statement that he was "just getting it for a friend." During the jury-out hearing, Officer Walcott offered testimony consistent with the above narrative indicating he initiated contact with the defendant after responding to a call regarding a suspected break-in on the lot, and after getting the defendant's personal information and placing him in the back of the squad car, he commented on the intelligence of the defendant's actions. The trial court then denied the motion to suppress, finding that while the defendant was in custody at the time he spoke to Officer Walcott, he was not subject to interrogation. Officer Walcott then proceeded to offer similar testimony in front of the jury.

After the State rested, the defendant then moved for judgment of acquittal, arguing in part that Mr. Hubbard's statement should not have been allowed into evidence because he was not Mirandized prior to giving it, and there was not a corroborating statement. The trial court denied the motion. The defendant declined to present any evidence on his behalf.

At the subsequent jury charge conference, the defendant requested Tennessee Pattern Jury Instruction 42.23 on destruction of evidence, arguing the State had a duty to preserve the dealership's video surveillance footage and failed to do so. The trial court denied the request, finding neither party presented proof at trial that the security camera footage would have been exculpatory, and the State was never in possession of the footage. After being charged, the jury found the defendant guilty of burglary of a motor vehicle, and the trial court imposed a six-year sentence to be served at sixty percent as a career offender.

The defendant filed a timely motion for a new trial, arguing the trial court erred when admitting the defendant's statement into evidence because it was the result of a custodial interrogation, and the defendant did not receive *Miranda* warnings prior to speaking with the arresting officer. The defendant further argued it was prejudicial error not to instruct the jury on the issue of spoliation of evidence despite proof the surveillance video from the car lot had not been preserved. Finally, the defendant argued his conviction was based on his statement alone, and the State did not introduce

additional evidence to corroborate his statement. The trial court denied the motion and adopted the jury's verdict. This timely appeal followed.

## *Analysis*

On appeal, the defendant again argues the trial court erred when admitting the defendant's statement into evidence and denying the defendant's request for a jury instruction on spoliation. The defendant further argues the jury's guilty verdict was against the weight of the evidence because it was based on the defendant's uncorroborated statement alone. Following our review of the submissions of the parties, record, and pertinent authorities, we conclude the trial court erred when denying the defendant's suppression motion, but this error was harmless. We further conclude the evidence presented at trial did not warrant a spoliation jury instruction, and the State presented more than sufficient evidence to support the jury's verdict. We affirm the judgment of the trial court.

## I.    Admissibility of the Defendant's Statement

On appeal, the defendant first argues the trial court erred by not suppressing his statement made to Officer Walcott. The State contends the defendant was not subject to interrogation at the time the defendant announced he was "just getting [the side view mirror] for a friend," so the trial court properly denied the defendant's motion to suppress. Based on our review of the record and applicable law, we agree the trial court erred when denying the suppression motion. However, this error was harmless. The State presented abundant evidence of the defendant's guilt, including an eyewitness to the burglary, so we affirm the judgment of the trial.

When reviewing the trial court's decision on a motion to suppress, we review the trial court's legal conclusions de novo. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). When conducting this analysis, we defer to the trial court's findings of fact unless the evidence preponderates against those findings. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). "[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing in the trial court is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith,* 978 S.W.2d 861, 864 (Tenn. 1998).

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." *State v. Berry*, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9). If a suspect is in custody

and under interrogation, or its functional equivalent, the police must first inform him of his Fifth Amendment rights in order for his confession to later be admissible as substantive evidence in the trial of the matter. *Miranda v. Arizona,* 384 U.S. 436, 524 (1966). *Miranda* warnings are not required in the absence of custodial interrogation. *State v. Northern,* 262 S.W.3d 741, 749 (Tenn. 2008) (citing *Miranda,* 384 U.S. at 478). In *Miranda,* the Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. In *Rhode Island v. Innis*, the United States Supreme Court expounded on the term "interrogation," providing this additional guidance for use by trial courts when determining whether the actions of a police officer constitute an interrogation or its functional equivalent:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known were reasonably likely to elicit an incriminating response*.

*Innis,* 446 U.S. at 301-02 (emphasis added) (footnote call numbers omitted).

Here, the defendant asserts Officer Walcott conducted a custodial interrogation or its functional equivalent without first giving *Miranda* warnings, so the trial court should have excluded his statement from evidence at trial. The defendant was undisputedly in custody at the time he spoke with Officer Walcott, and *Miranda* warnings were not given. Accordingly, we need only address whether Officer Walcott's words and actions comprised an interrogation, its functional equivalent, or questioning that falls under an exception to *Miranda*.

In response to the defendant's contention Officer Walcott should have provided *Miranda* warnings prior to commenting on the defendant's suspected malfeasance, the

State contends Officer Walcott did not ask any direct questions, so he did not engage the defendant in a custodial interrogation or its functional equivalent. In support of this argument, the State relies on *State v. March*, 395 S.W.3d 738 (Tenn. Crim. App. 2011). The facts of this case, however, are factually distinct from *March*. In *March*, the defendant, Mr. March, was arrested in Los Angeles, California and transported to Nashville, Tennessee. *Id*. at 762. During the flight, Mr. March began to question the detective accompanying him regarding his case. *Id*. The detective told Mr. March he knew he was represented by counsel and cautioned he did not have to speak to the police officers if he chose not to do so. *Id*. Despite this warning, over the course of a two-hour timespan, Mr. March persistently asked the detective questions about his case, stopping only to nap, read a magazine, and eat a snack. *Id*. at 463. The detective only offered responses and did not ask questions himself. *Id*.

This Court found Mr. March was unquestionably in custody at the time he conversed with the detective. *Id*. at 766. However, he was not subject to interrogation because it was Mr. March who continually initiated conversations with the detective. *Id*. When doing so, Mr. March focused on his own agenda of learning as much about his case as possible and later indicated that he and the detective were "'just two men having a conversation.'" *Id*. Noting the primary focus when determining whether an officer's words or actions were reasonably likely to invoke an incriminating response rests on "'the accused's perception rather than on the police officer's intent,'" this Court found the record did not support the defendant's contention he felt subject to interrogation during the flight. *Id*. (quoting *State v. Sawyer*, 156 S.W.3d 351, 354 (Tenn. 2005)).

The State's reliance on *March* is misplaced. Based on the testimony rendered by Officer Walcott during the suppression hearing, the officer initiated the conversation with the defendant. During their encounter, the defendant merely inquired into the reason for his arrest. After advising the defendant that he was "under suspicion of having broken into a vehicle on the lot," Officer Walcott put the defendant in the back of his squad car and offered this unprovoked commentary: "[T]hat was pretty bold what you did because of the fact there's cameras out here. I don't know if you know it, but it was an off duty police officer that saw you doing what you were doing and he made the phone call." The defendant responded, "I was just getting it for a friend of mine." Unlike the defendant in *March*, the defendant in this case did not engage the officer in conversation regarding his case; the officer engaged the defendant in conversation, and this conversation went beyond simply asking for the personal information needed to facilitate the arrest.

This matter is, instead, analogous to *State v. Thomas William Brown*, No. M2013-02327-CCA-R3-CD, 2015 WL 445542 (Tenn. Crim. App. Feb. 3, 2015), *no perm. app. filed*. In *Thomas William Brown*, this Court considered whether the words and actions of an arresting officer constituted the functional equivalent of a custodial interrogation. *Id*.

at *1. The matter arose as the result of two attempted aggravated burglaries of an apartment. *Id*. While responding to a call regarding the second attempted burglary, the police apprehended a suspect, Mr. Brown, in nearby woods. *Id*. at *2. After handcuffing him, the arresting officer asked for Mr. Brown's name and inquired into his reason for being in the woods. *Id*. In response, Mr. Brown said he had been looking at apartments in the nearby complex. *Id*. The arresting officer "'asked him why then was he in the woods because there was [sic] obviously no apartments in the wood line." *Id*. Mr. Brown stated "'that he saw some people with some flashlights and he became scared, so he got into the wood line to . . . hide from them.'" *Id*.

Mr. Brown later moved to suppress these statements from being introduced into evidence at trial, but the trial court denied the motion, finding the statements were not made in response to a custodial interrogation. *Id*. at *10. This Court disagreed, finding:

> In this case, [the arresting officer] handcuffed [Mr. Brown] and then asked him who he was and *why he was at the apartment complex*. Even if we could say that asking for [Mr. Brown's] identity amounted to words normally attendant to arrest, asking a suspect why he was at a particular location when investigating an attempted aggravated burglary is a question that a police officer should have known was reasonably likely to elicit an incriminating response. Therefore, the questioning constituted custodial interrogation and should have been preceded by *Miranda* warnings. Because *Miranda* warnings were not given, the statements should have been excluded from the State's case-in-chief. *See State v. Climber*, 400 S.W.3d 537, 567 (Tenn. 2013) (noting that "exclusion of the statements elicited during custodial interrogation 'is a complete and sufficient remedy for any perceived *Miranda* violation.'") (quoting *United States v. Patane*, 542 U.S. 630, 641-42 (2004) (plurality opinion)).

*Id*. at *12. We found this error to be harmless beyond a reasonable doubt because Mr. Brown later gave similar statements to detectives after receiving *Miranda* warnings. *Id*. Moreover, "[t]here was nothing particularly inculpatory" about the statements, so while they should have been suppressed, in light of the evidence as a whole, the error did not contribute to the guilty verdict. *Id*.

Again, like the arresting officer in *Thomas William Brown*, Officer Walcott initiated contact with the defendant by asking him to step out of the vehicle. Once the defendant exited his car, Officer Walcott asked for the defendant's name and personal information. The defendant asked why he was being detained, and Officer Walcott answered his question. After arresting the defendant and placing him in the back of the squad car, where he was undisputedly detained, Officer Walcott offered his unsolicited

statement regarding the defendant's actions. This statement went a step further than asking the defendant why he was in the location of the burglary; he informed the defendant that he had been seen on the car lot breaking into a vehicle, and his actions had been captured on film. We acknowledge previously finding "[t]he disclosure of incriminating evidence to a suspect . . . does not necessarily constitute interrogation within the meaning of *Innis*." *State v. Maraschiello*, 88 S.W.3d 586, 603 (Tenn. Crim. App. 2000) (internal citations omitted). However, considering the circumstances as a whole, Officer Walcott should have known this statement was reasonably likely to elicit an incriminating response from the defendant. Moreover, by essentially admitting to the burglary in response, the defendant clearly perceived this statement as one requiring an incriminating response. The trial court erred when denying the defendant's motion to suppress his statement that he was "just getting it for a friend."

Considering the evidence presented at trial as a whole and the overwhelming evidence against the defendant, the trial court's error was harmless, as it did not "more probably than not [affect] the judgment or . . . result in prejudice to the judicial process." Tenn. R. App. P. 36(b). The jury found the defendant guilty of burglary of a motor vehicle. Pursuant to Tennessee Code Annotated section 39-14-402, "[a] person commits burglary who, without the effective consent of the property owner . . . "[e]nters any freight or passenger car, automobile, truck, trailer, boat or other motor vehicle with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402(a)(4). Even in the absence of the defendant's statement that he was "just getting it for a friend," the State introduced ample evidence of the defendant's guilt at trial.

In support of its case-in-chief, the State called four witnesses and exhibited photographs of the damaged vehicle. Mr. Melson testified that the dealership was closed on Sunday, December 29, 2013, so all the vehicles on the lot would have been locked. While the dealership was closed, nobody, including the defendant, had permission to unlock and get inside the vehicles on the lot. Mr. Hentz then testified that while walking through the closed car lot on December 29, 2013, he observed the defendant inside a truck, tampering with its side paneling. As Mr. Hentz got closer to the truck, he noticed the side paneling had been removed and was strewn across the seats of the vehicle. In addition, there were bolts on the ground near the truck. Officer Walcott responded to Mr. Hentz's call for help, and witnessed the defendant attempting to leave the dealership with a silver socket wrench in the front passenger seat of his car. Officer Patrick arrived at the scene after the defendant had already been arrested and, as part of her investigation, found the silver socket wrench and rubber gloves in the defendant's car. This evidence was more than sufficient to support the jury's verdict. The defendant is not entitled to relief on this issue.

## II. Spoliation

Next, the defendant asserts the trial court failed to give proper jury instructions. Specifically, he asserts the trial court should have included Tennessee Pattern Jury Instruction 42.23 regarding the loss or destruction of evidence because the State failed to request and retain the video footage from the car dealership's security cameras, which potentially documented the break-in occurring December 29, 2013. The State contends it did not have a duty to preserve the car dealership's security footage, so the jury instruction was unwarranted. We agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will only be considered prejudicially erroneous if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)).

The defendant requested the trial court to include Tennessee Pattern Jury Instruction 42.23 in its instructions to the jury, which states:

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

> If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

7 Tenn. Prac. Pattern Jury Instr. TPI – Crim. 42.23 (footnote omitted). This instruction is based on the holding of *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), where our Supreme Court held the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial. *Id*. at 915-16. In *Ferguson*, the Tennessee Supreme Court adopted "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013). The Court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id*. at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

When applying this balancing test, the trial court must first decide whether the State had a duty to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. Only constitutionally material evidence must be preserved, and to be constitutionally material, the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. (citing *Ferguson*, 2 S.W.3d at 917). If the State did have a duty to preserve the evidence, and breached that duty, the trial court must next determine whether a trial without the evidence would be fundamentally fair. *Ferguson*, 2 S.W.3d at 917. When doing so, the trial court must apply these three factors to the case:

> (1) The degree of negligence involved;
>
> (2) The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
>
> (3) The sufficiency of the other evidence used at trial to support the conviction.

*Id*. We review the trial court's decision regarding the fundamental fairness of the trial under a de novo standard. *Merriman*, 410 S.W.3d at 790.

If, after considering these three factors, the trial court determines the trial was or would be fundamentally unfair in the absence of the unpreserved evidence, it may impose an appropriate remedy. *Merriman*, 410 S.W.3d at 785-86. Appropriate remedies include, but are not limited to, the dismissal of the charges or providing Tennessee Pattern Jury Instruction 42.23. *Id*. We review the appropriateness of the remedy imposed by the trial court under an abuse of discretion standard. *Id*.

This Court previously considered the State's duty to preserve video surveillance footage in *State v. Yevette Somerville*, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730 (Tenn. Crim. App. Feb. 11, 2002). When doing so, we noted:

> Previously, this [C]ourt has held that "[t]he prosecution is not required to disclose information that the accused already possesses or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (citing *State v. Caldwell*, 656 S.W.2d 894, 897 (Tenn. Crim. App. 1983); *Banks v. State*, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)). Additionally, the court held that the prosecution is not required to disclose "information which is not possessed by or under the control of the prosecution or another governmental agency." *Id*. (citing *Banks*, 556 S.W.2d at 90). Ultimately, the *Marshall* court held that the defendant "'must bear the responsibility of [his] failure to seek its discovery' "if the evidence is accessible to both the prosecutor and the defendant. *Id*. (quoting *United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985), *cert. denied*., 474 U.S. 1086, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986).

*Id*. at *4. Based on these authorities, we held the State did not have a duty to obtain and preserve surveillance video footage from WalMart prior to its destruction because it was equally accessible to the defendant, and the video footage was never in the State's possession or control. *Id*. Because we found the State did not have a duty to preserve the video surveillance footage at issue, it was unnecessary for us to apply the three *Ferguson* factors and determine the fundamental fairness of the trial in the absence of the evidence. *Id*. at *5.

In the present matter, we likewise conclude the State did not have a duty to preserve the video surveillance footage from December 29, 2013. The surveillance video, if it ever existed, was never in the possession of the State or another governmental agency, and both parties had an equal ability to obtain the video. Mr. Melson testified that he does not know what happened to the surveillance video from that date, but typically the footage is only kept forty-eight hours. Mr. Melson did not know whether the dealership made an attempt to save the footage, but as of the date of trial, he did not have it. Officer Patrick testified that following the break-in, she spoke with Mr. Melson regarding the video cameras on the lot and learned they may not have been working, so the incident may not have been captured on film. She assumed the detectives would follow up in an effort to obtain the video evidence, if it existed, and never spoke with Mr. Melson again regarding the security cameras.

Moreover, the parties did not present evidence at trial indicating the surveillance video had any exculpatory value. Instead, Mr. Hentz and Officer Walcott both testified

- 11 -

they witnessed the defendant on the car lot the day in question, and Mr. Hentz observed the defendant breaking into one of the vehicles on the car lot. Both Mr. Hentz and Officer Walcott identified the defendant in the courtroom. For these reasons, the trial court properly denied the defendant's request for the inclusion of Tennessee Pattern Jury Instruction 42.23.

Because we hold the State did not have a duty to preserve the video surveillance footage from December 29, 2013, it is not necessary for us to determine the fundamental fairness of the trial in the absence of the evidence by applying the three *Ferguson* factors. The defendant is not entitled to relief on this issue.

## III.    Corroboration of the Defendant's Statement

Finally, the defendant asserts the guilty verdict is against the weight of the evidence because it is supported solely by his own incriminating statement and no other corroborating evidence. The State disagrees and points to the overwhelming evidence against the defendant, including the testimony of the officers and photographs of the damaged vehicle. We agree with the State.

When a defendant has been charged with a crime resulting in a tangible injury, "a defendant's extrajudicial confession is sufficient to support a conviction only if the State introduces independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury." *State v. Bishop*, 413 S.W.3d 22, 58 (Tenn. 2014) (citations and internal quotation marks omitted). Our Supreme Court has offered this explanation for the corroboration rule:

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

*Id*. at 60. "Prima facie" evidence is "'[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.'" *State v. Clark*, 452 S.W.3d 268, 280 (Tenn. 2014) (quoting *Black's Law Dictionary* 638-39 (9th ed. 2009)). "'Substantial evidence'" is "'[e]vidence that a reasonable mind could accept as adequate to support a

conclusion; evidence beyond a scintilla.'" *Clark*, 452 S.W.3d at 280. The threshold of proof necessary to meet the corroboration requirement is low, even lower than the "preponderance of the evidence" standard, as its purpose is merely to exclude the possibility of a false confession. *Id*.

The question of whether an extrajudicial confession is adequately corroborated is a mixed question of law and fact, and we review it under a de novo standard. *Bishop*, 431 S.W.3d at 60. If the corroboration challenge is based on disputed facts, this Court should presume the trial court's resolution of the factual dispute is correct unless the evidence preponderates against those findings. *Id*.

We have already concluded the trial court erred when denying the defendant's motion to suppress, but given the otherwise overwhelming proof against the defendant, this error was harmless. As explained in Section I *supra*, even in the absence of the defendant's statement that he was "just getting it for a friend," the State introduced ample evidence of the defendant's guilt at trial. Because the State offered more than sufficient corroboration of the defendant's admission, the defendant is not entitled to relief on this issue.

### *Conclusion*

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE